UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
EZRA LESLIE,

                    Petitioner,

        -against-                      MEMORANDUM & ORDER
                                       10-CV-2391(JS)
THOMAS LaVALLEY, Superintendent of
Clinton Correctional Facility,

                    Respondent.
---------------------------------X
APPEARANCES
For Petitioner:      Ezra Leslie, pro se
                     03-A-3404
                     Clinton Correctional Facility
                     P.O. Box 2001
                     Dannemora, NY 12929

For Respondent:      Edward A. Bannan, Esq.
                     Suffolk County District Attorney's Office
                     200 Center Drive
                     Riverhead, NY 11901

SEYBERT, District Judge:

        Pro Se petitioner, Ezra Leslie ("Petitioner") petitions

this Court for a writ of habeas corpus pursuant to 28 U.S.C. §

2254.  For the following reasons, his Petition is DENIED.

                           BACKGROUND

I.  Factual Background

        In 2000, Petitioner and Tonya Brodie ("Brodie") had a

sexual affair that ended in July 2001.  (Trial Tr. 1093:13-22.)

Petitioner attempted to continue the affair after it ended, but

Brodie rejected his advances.  (Trial Tr. 1094:6-17.)  Petitioner

complained    that    Brodie's    sister,    Gwendulina    Brodie    ("the

victim"), was interfering with Petitioner's attempt to continue the affair. (See, e.g., Trial Tr. 953:24-954:1; 1096:12-14.)

On September 20, 2001, Petitioner arrived at the victim's house with a bottle of rum. (Trial Tr. 954:11-23.) Petitioner drank with the victim's boyfriend, James Jones ("Jones"). (Trial Tr. 954:24-955:4.) Petitioner complained again that the victim was interfering with his relationship with Brodie. (Trial Tr. 956:3-11.) When the victim arrived at her home, Jones went upstairs to change his clothes. (Trial Tr. 957:6-9.) Petitioner and the victim began to argue. (Trial Tr. 957:15-958:2.) Petitioner, an off-duty police officer (Resp't's Return,[1] Docket Entry 13, at 8.), took off his gun-belt and let it drop to the ground in an attempt to fight Jones. (Trial Tr. 965:10-17.) Jones eventually persuaded Petitioner to leave Jones' property. (See, e.g. Trial Tr. 965:18-966:1.)

The victim continued to yell at Petitioner from inside of her house. (Resp't's Return at 11.) When Jones went outside again, Petitioner's gun was no longer there. (Resp't's Return at 12.) Petitioner's brother arrived at the scene and heard Petitioner yell "vengeance is mine." (Resp't's Return at 12.)

A half hour later, Jones and the victim (while in their bedroom) heard a noise. (Trial Tr. 981:24-982:2.) The victim

---

[1] Respondent's Return does not include page numbers. The Court's pagination refers to the page numbers generated by the electronic Case Filing System.

went into the hallway with Jones behind her. (Trial Tr. 982:24-983:2.) Jones heard a pop sound and saw someone standing in the hallway. (Trial Tr. 983:2-3.) After another pop sound, the victim fell onto the floor. (Trial Tr. 983:4.) Jones went to the victim's side and saw the shooter was Petitioner. (Trial Tr. 983:5-20.) Jones saw Petitioner shoot the victim three more times. (Trial Tr. 984:7-9.) The victim's daughter also identified Petitioner as the shooter. (Trial Tr. 1138:12; 1143:15-23.) Jones pushed Petitioner out of the house and he called 911. (Trial Tr. 984:22-985:13; 986:16-17.)

Suffolk County Police Officers Steven Bardak and William Walsh received the call to respond to the shooting at 1072 Connetquot Avenue, Central Islip, New York. (Hr'g Tr. 4:25-5:10.) Upon arriving at the scene, Bardak saw two African-American males running away from the house. (Hr'g Tr. 7:8-15.) Bardak saw that one of the men had a handgun and commanded the man to drop his weapon. (Hr'g Tr. 8:13-20.) The men complied and laid on the ground. (Hr'g Tr. 8:20-22.) Petitioner told Bardak, "I'm the one you want. I did it. I shot her and I'm not going to say anything more about it until I have representation." (Hr'g Tr. 14:16-19.) Bardak handcuffed Petitioner and placed him in the backseat of the patrol car. (Hr'g Tr. 16:13-19; 17:15-16.) Bardak transcribed Petitioner's initial statement (Hr'g Tr. 18:1-7), then transcribed Petitioner's second statement, in which

Petitioner stated "this is a bad situation that got out of hand. I'm sorry."  (Hr'g Tr. 19:3-6.)

Police Officer O'Hara rode in the ambulance with the victim.  (Resp't's Return at 15.)  "In the ambulance, the victim responded to stimuli and nodded her head when O'Hara spoke to her."  (Resp't's Return at 15.)  The victim told O'Hara that Petitioner shot her because of her sister.  (Trial Tr. 160:16-21.)  "The victim maintained eye contact with O'Hara through the questioning."  (Resp't's Return 15.)  When the victim began to show signs of cyanosis,[2] O'Hara stopped questioning her.  (Trial Tr. 162:23-163:11.)  The victim died two hours later.  (Resp't's Return at 15; Trial Tr. 164:17-18.)

## II.  Legal Background

Petitioner was charged with two counts of Murder in the Second Degree, in violation of New York Penal Law ("N.Y.P.L.") §§ 125.25(1) and 120.25(2), respectively.  (Resp't's Return ¶ 4.)

At a pre-trial Huntley hearing, Bardak testified that he did not question Petitioner, he did not read Petitioner his Miranda rights, nor did he threaten Petitioner or exchange promises with Petitioner.  (Resp't's Return at 9.)  After the Huntley hearing, the State court held that Petitioner's

---

[2] "Cyanosis is a bluish color to the skin or mucus membranes that is usually due to a lack of oxygen in the blood."  (David C. Dugdale, III, MD, Skin Discoloration – bluish, http://www.nlm. nih.gov/medlineplus/ency/article/003215.htm, last visited March 11, 2014.)

statements were admissible as spontaneous statements. (Resp't's Return at 9.)

On June 12, 2003, at the conclusion of a jury trial, Petitioner was found guilty of Murder in the Second Degree (N.Y.P.L. § 125.25(1)). (Pet., Docket Entry, ¶ 5.) Petitioner was sentenced to twenty-five-years-to-life. (Pet. ¶ 3.)

Petitioner appealed the conviction to the New York Appellate Division, Second Department. (Pet. ¶¶ 8-9.) Petitioner, through his appellate counsel, argued that the trial court: (1) denied Petitioner his due process rights by refusing "to charge the jury on the affirmative defense of extreme emotional [distress]"; (2) erred by admitting Petitioner's inculpatory statements into evidence; and (3) sentenced Petitioner to an excessive prison term. (See, e.g., Resp't's Return ¶ 6.) Petitioner submitted additional claims through a supplemental brief. (Pet'r's Br., Docket Entry 2.) Petitioner argued, that the trial court: (4) denied Petitioner's due process and equal protection rights by agreeing to an all-Caucasian jury even though Petitioner is African-American; (5) improperly denied Petitioner his right to effective assistance of counsel; (6) erred by charging the jury with intentional murder and depraved indifference; and (7) erred by permitting the prosecutor to deny Petitioner his right to a fair trial. (Resp't's Return ¶ 7.)

On June 5, 2007, the Appellate Division affirmed the judgment. People v. Leslie, 41 A.D.3d 510, 837 N.Y.S.2d 304 (2d Dep't 2007). The court held that the trial court: (1) properly declined to charge the jury with the affirmative defense of extreme emotional distress; (2) properly admitted Petitioner's statement into evidence; and (3) did not impose an excessive sentence. Leslie, 837 N.Y.S.2d at 306-06. The Appellate Division held additionally that Petitioner's pro se claims were "without merit." Id. at 306.

Petitioner applied for leave to appeal to the New York Court of Appeals. (See Pet. ¶ 9(g).) The New York Court of Appeals denied Petitioner's application on September 20, 2007. People v. Leslie, 9 N.Y.3d 923, 875 N.E.2d 897, 844 N.Y.S.2d 178 (N.Y. 2007). "Petitioner also sought reconsideration by the [New York] Court of Appeals of its denial. On December 20, 2007, the Court of Appeals denied [P]etitioner's application for reconsideration." (Resp't's Return ¶ 11 (citing People v. Leslie, 9 N.Y.3d 1007, 880 N.E.2d 881, 850 N.Y.S.2d 395 (N.Y. 2007).)

On October 7, 2008, Petitioner filed a motion to vacate judgment in County Court, Suffolk County. (Pet. ¶ 11(a).) Petitioner argued that the trial court: (1) denied Petitioner his due process rights regarding "newly discovered evidence" that allegedly exonerated Petitioner; and (2) denied his Sixth

Amendment right to effective assistance of counsel. (Pet. ¶ 11(a)(5).) On January 23, 2009, the court denied Petitioner's motion. (Pet. ¶ 11(a)(7-8).) On February 20, 2009, Petitioner requested permission to appeal the court's decision. (Pet. ¶ 11(a)(9).) On July 23, 2009, the Appellate Division denied Petitioner's request. (Pet. ¶ 11(a)(10).) "Petitioner sought to reargue, which [ ] was also denied." (Resp't's Return ¶ 15.)

On May 14, 2010, Petitioner filed a second motion to vacate judgment. (Resp't's Return ¶ 16.) He again argued that he was denied his due process rights regarding "newly discovered evidence" that allegedly exonerated Petitioner. (Resp't's Return ¶ 16.) On July 14, 2010, the court denied Petitioner's motion. (Resp't's Return ¶ 18.) Petitioner requested permission to appeal the denial. (Resp't's Return ¶ 19.) On November 10, 2010, the Appellate Division denied Petitioner's request. (See Pet'r's December 11, 2010 Letter, Docket Entry 20, Ex. 1.)

On July 29, 2009, Petitioner filed a Petition for a Writ of Corum Nobis. (Pet. ¶ 11(b)(3-4).) Petitioner argued that he was denied his Sixth Amendment right to effective assistance of appellate counsel. (Pet. ¶ 11(b)(5).) On January 5, 2010, the Appellate Division denied the petition. People v. Leslie, 69 A.D.3d 654, 891 N.Y.S.2d 293 (2d Dep't 2010). On March 18, 2010, the New York Court of Appeals denied Petitioner's motion for leave to appeal the Appellate Division's decision.

People v. Leslie, 14 N.Y.3d 802, 925 N.E.2d 940, 899 N.Y.S.2d 136 (N.Y. 2010).

III.  The Petition

Petitioner asserts the following grounds: (1) Petitioner was denied his Sixth Amendment right to effective assistance of trial counsel; (2) Petitioner was denied his Sixth Amendment right to effective assistance of appellate counsel; and (3) Petitioner was denied his due process and fair trial rights when the County Court denied Petitioner's motion to vacate judgment despite Petitioner's showing of newly discovered evidence. (See Pet. ¶ 12.)

## DISCUSSION

The Court will first address the applicable legal standard before turning to the merits of the Petition.

I.  Legal Standard

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." Harrington v. Richter, --- U.S. ----, 131 S. Ct. 770, 780, 178 L. Ed. 2d 624 (2011).

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(a).

A federal court may grant a writ of habeas corpus to a state prisoner when prior state adjudication of the prisoner's case "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id. at § 2254(d)(1). "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen v. Pinholster, --- U.S. ----, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011) (citations omitted).

During a review of a petition for a writ of habeas corpus, federal courts presume that the state court's factual determinations are correct. See 28 U.S.C. § 2254(e)(1).

A. Exhaustion

A state prisoner seeking federal habeas review of his state conviction is required to first exhaust all remedies available to him in state court. See 28 U.S.C. § 2254(b)(1)(A). "Exhaustion requires a petitioner fairly to present the federal claim in state court." Jones v. Keane, 329 F.3d 290, 294 (2d Cir. 2003). Presentation means a petitioner "has informed the state court of both the factual and the legal premises of the

claim he asserts in federal court." Id. at 295 (internal quotation marks and citations omitted).

B.  Procedural Default

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565, 115 L. Ed. 2d 640 (1991).

The Second Circuit "has held that 'federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim.'" Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996) (quoting Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); citing Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 1044 n.10, 103 L. Ed. 2d 308 (1989); Wedra v. Lefevre, 988 F.2d 334, 338-39 (2d Cir. 1993)).

II.  Grounds One and Two: Ineffective Assistance of Trial and Appellate Counsel

A.  Standard

"It has long been recognized that the right to counsel is the right to the effective assistance of counsel." McMann v.

Richardson, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 1449 n.14, 25 L. Ed. 2d 763 (1970) (citing Reece v. Georgia, 350 U.S. 85, 90, 76 S. Ct. 167, 170, 100 L. Ed. 77 (1955); Glasser v. United States, 315 U.S. 60, 69-70, 62 S. Ct. 457, 464-65, 86 L. Ed. 680 (1942); Avery v. Alabama, 308 U.S. 444, 446, 60 S. Ct. 321, 322, 84 L. Ed. 377 (1940); Powell v. Alabama, 287 U.S. 45, 57, 53 S. Ct. 55, 59-60, 77 L. Ed. 158 (1932)).

In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court established a two-part test to determine whether counsel's assistance was ineffective. First, "[Petitioner] must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. To meet the first prong of the Strickland test, Petitioner must overcome the strong presumption that the challenged action was sound trial strategy under the circumstances at the time. See id. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [Petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound [] strategy." (internal quotation marks and citation omitted)). Second, Petitioner must show that counsel's performance prejudiced his defense; "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." Id. at 694 (noting "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.")

The Strickland standard also applies to appellate counsel. See, e.g., Forbes v. United States, 574 F.3d 101, 106 (2d Cir. 2009). "[Appellate] counsel does not have a duty to advance every non[-]frivolous argument that could be made." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (citing Jones v. Barnes, 463 U.S. 745, 754, 103 S. Ct. 3308, 3314, 77 L. Ed. 2d 987 (1983)).

B.  Analysis

1.  Trial Counsel

Petitioner maintains that he was denied effective assistance of trial counsel. (Pet. at 5-7.) Petitioner argues trial counsel was deficient as to: (1) counsel's failure to stop the prosecutor from admitting false testimony, failing to impeach such testimony, and failing to request a mistrial because of the prosecutor's tactics (Pet'r's Br. at 8-15; see also id. at 23-50); (2) counsel permitting an all-Caucasian jury to act as fact-finder in Petitioner's criminal trial (Pet. at 5; see also Pet'r's Br. at 15-16); (3) counsel's failure to advocate for a mistrial and "telling the Court he never said [Petitioner] [did not] commit the crime." (Pet'r's Br. at 16-20); (4) counsel's failure to argue Petitioner's "actual innocence" (Pet. at 5; see

also Pet'r's Br. at 20-23); (5) counsel's failure to offer character witnesses on Petitioner's behalf (Pet'r's Br. at 50); and, (6) counsel's failure to introduce evidence of where on her body the victim was shot (Pet'r's Br. at 50-52).

The Appellate Division held that Petitioner's claims were without merit. See Leslie, 837 N.Y.S.2d at 306.

a.    Prosecutor's Questioning

i.    911 Transcript

Petitioner argues that his trial counsel failed to impeach Nassau County Police Officer Bardak's testimony during the pre-trial Huntley hearing.  Bardak testified that, as he and his partner arrived at the scene at 7:31 p.m., "[Bardak] saw two black males running from a fence between 1072 and 1068 approaching the stoop of number 1068 Connetquot Avenue."  (Hr'g Tr. 7:5-15.)  Bardak also testified that one of the men "had what appeared to be a handgun in his hand."  (Hr'g Tr. 8:13-15.) Petitioner argues that the 911 "CAD Completed Call List" (herein, the "CAD")--a computer-generated list that details the dispatch-- shows Bardak lied in his testimony.  (See Pet'r's Br., Ex. 1.) The CAD notes that the 911 call was received at 9:27 p.m.; it states, in the remarks section, "subject still next door is a NYPD det at 1068?"  Petitioner asserts that the CAD shows that he was at his own house at 1068 Connetquot Avenue, not fleeing from the victim's house at 1072 Connetquot Avenue as Bardak testified.

As counsel had the CAD at the hearing, Petitioner argues, counsel was ineffective for failing to raise this point.

Counsel did, in fact, question Bardak as to what Bardak saw as he arrived at the scene. Bardak testified, in response to counsel's question, that he did not see Petitioner on the property of 1072 Connetquot Avenue. (See Hr'g Tr. 29:11-13.[3]) Trial counsel may have strategically chosen not to pursue this argument in greater detail because there was no evidence to support that Petitioner was at 1068 Connetquot Avenue or because it was possible for a person to run back and forth between the two houses more than once in a few minutes span. Petitioner has not set forth enough to overcome the high burden under Strickland. See Strickland, 466 U.S. at 689.

Moreover, Petitioner fails to show prejudice. Assuming, arguendo, counsel argued this point successfully and that the Court denied the prosecution's motion to include Petitioner's admission of guilt, there is no reason to conclude Petitioner would have overcome the other witness testimony. Therefore, the Petition is DENIED in this regard.

---

[3] **Counsel:** . . . You never saw them in the yard at 1072?
**Bardak:** No.
**Counsel:** So they were on the property of 1068 but near the fence line?
**Bardak:** That's correct.

ii.  <u>Witness Impeachment & False Testimony</u>

Petitioner further argues that counsel failed to impeach witness testimony and failed to show the court that those witnesses falsely testified during the trial.  For the reasons set forth above, however, this claim is denied as to Officer Bardak and his partner, Officer Walsh.  Petitioner fails to meet his burden to establish that they falsely testified about Petitioner's location upon their arrival at the scene.

Petitioner also argues that counsel should have impeached Detective Heinssen's testimony.  Specifically, he maintains that Detective Heinssen falsely testified that Petitioner was not injured, when in fact there was evidence to show otherwise.  (Pet'r's Br. at 25.)  Petitioner fails to show any prejudice as to Heinssen's testimony.  Heinssen fingerprinted Petitioner upon his arrival at the police station.  (Pet'r's Br. at 25.)  Impeaching Heinssen would not have overcome the witness testimony or Petitioner's own statement of guilt.

Moreover, Petitioner argues that counsel should have impeached the testimony of Officer O'Hara and Paramedic Stark.  Petitioner argues that Stark, in his Prehospital Care Report ("PCR") (<u>see</u> Pet'r's Br., Ex. 4[4]) did not check the "alert" box under the "level of consciousness" column suggesting that the

---

[4] For a blank copy, <u>see</u> http://www.health.ny.gov/professionals/ ems/pcr_5/agency_copy_front_white.pdf.

victim was never conscious, contrary to testimony.  In the PCR, Stark checked the victim's vital signs three times.  During each check, Stark noted the victim's "GCS".[5] During the first check, the victim's GCS was a 9; the victim's GCS improved to a 10 during the second measurement and remained there during the third measurement.  Stark testified that the victim's "condition was improved from when [the paramedics] initially first responded.  Her condition improved where she was answering the questions better[.]"  (Trial Tr. 176:9-11.)  Stark's testimony corresponds to the victim's improved GCS measurement as tallied in the PCR.  Moreover, during the second and third measurement, Stark checked the "voice" box as to the victim's level of consciousness; during the first measurement, Stark checked "pain", a lower level of consciousness as listed on the PCR.  Stark's check of "voice" corresponds with O'Hara and Stark's own testimony that the victim was responsive to O'Hara's questions.

Petitioner additionally argues that counsel should have impeached the testimony of the victim's daughter, Olivia, regarding whether she identified Petitioner as the shooter during

_____

[5] GCS stands for "Glascow Coma Scale", which measures one's eye movement response, verbal response, and motor response.  See, e.g., http://www.bt.cdc.gov/masscasualties/pdf/glasgow-coma-scale.pdf.  The GCS provides a score from 3 to 15; "patients with scores of 3-8 are usually said to be in a coma."  Prof. Russ Rowlett, How Many? A Dictionary of Units of Measurement, available at http://www.unc.edu/~rowlett/units/scales/ glasgow.htm.

16

the underlying events. (See Pet'r's Br. at 38-44.) Olivia testified that when she first saw a man in the hallway, she did not immediately identify him. (See Trial Tr. 1138:19-22.) Olivia then testified that she saw Jones fight Petitioner after she witnessed her mother and Jones leave their bedroom. (See Trial Tr. 1141:13-18.) Olivia also testified that she specifically saw Petitioner shoot her mother while her mother was on the floor. (See Trial Tr. 1143:15-1144:6.)

Petitioner argues that Jones' testimony that he did not know where Olivia was during the shooting proves Olivia's testimony was false. Petitioner also argues Olivia's testimony that she did not see her mother fall to the floor proves Olivia gave false testimony. Neither of these contentions is valid: Olivia's definitive testimony overrides Jones' uncertain recollection of Olivia's whereabouts. Further, Olivia testified that she saw Petitioner shoot her mother while her mother was on the ground. The fact she did not see her mother fall to the ground is irrelevant. Accordingly, Petitioner has not shown that counsel was ineffective for failing to make these arguments, as he may have strategically determined them to be weak.

b. Jury's Racial Composition

Before the Court may reach a conclusion as to the ineffective assistance of counsel claim as it relates to the jury's racial composition, the Court must determine whether a

Constitutional issue existed regarding the racial makeup of the jury in Petitioner's trial.[6]   Petitioner must prove that the trial court violated the Sixth Amendment's "cross-section requirement."   See, e.g., Berghuis v. Smith, 559 U.S. 314, 319, 130 S. Ct. 1382, 1387, 176 L. Ed. 2d 249 (2010) (noting a "criminal defendant['s] [] right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community") (citing Taylor v. Louisiana, 419 U.S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975)).

   "To establish a prima facie violation of the fair-cross-section requirement . . . a defendant must prove that: (1) a group qualifying as "distinctive" (2) is not fairly and reasonably represented in jury venires,[7] and (3) "systematic exclusion" in the jury-selection process accounts for the underrepresentation."   Id. at 327 (citing Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)).   "The first showing is, in most cases, easily made; the second and third are more likely to generate controversy."   Id. at 319.

   African-Americans are clearly a distinctive group that must be represented in jury venires.   (See generally Berghuis,

---

[6] Logically, trial counsel could not have been Constitutionally-ineffective if the underlying issue (the jury's racial makeup) was not Constitutionally-deficient.

[7] A venire is "an entire panel from which a jury is drawn." (Merriam-Webster Online Dictionary. 2014. http://www.merriam-webster.com (March 11, 2014).)

559 U.S. 314.)  Thus, Petitioner establishes the first step.  He fails, however, to establish step two or three.  Petitioner fails to show that African-Americans were not reasonably represented in his jury venire nor does he establish that, <u>arguendo</u>, the exclusion of African-Americans was systematic.  For instance, Petitioner does not provide one example when a non-white juror was excluded.  As Petitioner has not established that his jury was Constitutionally-deficient, Petitioner cannot establish that his trial counsel's performance, as to this issue, was ineffective.

c.  <u>Mistrial & Advocacy</u>

i.  <u>Mistrial</u>

Moreover, Petitioner argues his trial counsel was ineffective "for allowing [the trial court] to deny [Petitioner's] request for a mistrial."  (Pet'r's Br. at 19.) Trial counsel made a strong argument to the trial court regarding Petitioner's request for a mistrial.  (Trial Tr. 1006:3-1008:13.) The prosecution opposed the motion and the trial court denied it. (Trial Tr. 1008:16-1009:6; 1009:16-1010:23.)  Accordingly, counsel made a good faith effort and the trial court's ruling was reasonable.  Petitioner fails to establish either of the <u>Strickland</u> prongs.

ii.  <u>Advocacy</u>

In addition, Petitioner argues that counsel abandoned his loyalty to Petitioner when counsel stated, during a side-bar, "I strenuously object to [the prosecutor's] assertion, that the defense thus far has been that he didn't do it.  I challenge her to go anywhere in the record where I said that he didn't do it. . . ." (Trial Tr. 789:21-790:6.)  Petitioner argues he "could never have a fair trial when the [j]ury heard his attorney asserting he never said his client didn't do it."  (Pet'r's Br. at 19.)

As the conversation took part in a side-bar, the jury did not hear counsel make this statement.  (See Trial Tr. 787:8-9 ("Whereupon the following occurred at side-bar out of the hearing of the jury."))  Thus, Petitioner cannot establish the prejudice prong of the Strickland analysis.  Moreover, during the side-bar, counsel was strenuously advocating on Petitioner's behalf.  Counsel made the above statement because the prosecutor was attempting to introduce a post-arrest photograph of Petitioner in order to show, the prosecutor claimed, Petitioner's size at the time of the murder.  (See Trial Tr. 788:16-21.)  Petitioner's counsel was arguing that he had not yet mentioned Petitioner's actual innocence and, thus, the photograph did not have probative value.  The Court agreed with counsel's forceful argument.  (See Trial Tr. 792:8-14 ("Okay. Take it easy, [counsel]. . .  I am not letting [the photographs] into evidence until I see some

testimony or some evidence that tend to connect these . . . with
your client.")) Counsel's advocacy was entirely effective and
thus fails the first prong of <u>Strickland</u> analysis.

### d. Actual Innocence

Petitioner also argues that his trial counsel should
have presented evidence of Petitioner's innocence. Petitioner's
claim is meritless. As noted, two witnesses, including the
victim, identified Petitioner as the shooter. (<u>See</u> Resp't's
Return at 13, 15.) Petitioner himself told Officer Bardak that
he shot the victim. The standard is not whether trial counsel
was perfect; rather, it is whether counsel's representation was
reasonable. Moreover, as noted <u>supra</u>, "counsel does not have a
duty to advance every non[-]frivolous argument that could be
made." <u>Mayo</u>, 13 F.3d at 533. The Court may not take a leap that
an "actual innocence" defense would have overcome two
eyewitnesses and Petitioner's own statement of guilt.

Furthermore, Petitioner's argument as to "the
'Scientific fact' that had the [P]etitioner been standing right
on top of the victim for three shots as James Jones falsely
testified to, blood spatter would have been on the [P]etitioner .
. . ." (Pet'r's Br. at 21 (citing Grand Jury Tr 38:17-19).)
This is wholly without merit. Jones testified that after the
first shot he could see Petitioner aiming the gun down the hall,
when Jones reached the victim, Petitioner was by this time--right

on top of her.  Jones testified the distance to be "a few good strides."  (Resp't's Br., Docket Entry 13-2, at 4 (citing Grand Jury Tr. 38).)  Also, the forensic scientist who testified at trial testified that gun-shot residue is lost when the target is more than 36-to-48 inches from the gun.  (See Trial Tr. 931:21-933:18.)  Moreover, the Court notes, again, that two eyewitnesses, and Petitioner himself, stated that Petitioner was the shooter.

### e.  Character Witnesses

Next, Petitioner argues that trial counsel was Constitutionally-ineffective because he failed to call any character witnesses on Petitioner's behalf.  Assuming, arguendo, that trial counsel's failure to call witnesses was deficient, Petitioner fails to establish the prejudice prong of Strickland analysis.  Petitioner fails to establish how such testimony would have overcome the eyewitness testimony or Petitioner's own admission of guilt.

### f.  Location of Gun-shots

Finally, Petitioner argues that his trial counsel was ineffective because he should have presented evidence to the court that the victim was shot in the vaginal area as proof that Jones killed the victim when Jones--the victim's boyfriend-- committed the murder in a jealous rage.  Petitioner's argument is denied as Petitioner has failed to provide any evidence to

support this theory. Petitioner presents no evidence to support his notion that Jones was the killer and the murder was a "crime of passion." Petitioner fails to establish either <u>Strickland</u> prong. As noted, trial counsel's failure to present this argument would not have overcome the witness testimony or Petitioner's statement of guilt.

Accordingly, Petitioner's ground one claims are wholly DENIED.

### 2. Appellate Counsel

Petitioner states that, during the grand jury phase of his criminal case, "the prosecutor fail[ed] to notify [P]etitioner about the upcoming [g]rand [j]ury [p]roceeding, denying [P]etitioner of his right to testify on his own behalf." (Pet. at 7.) Petitioner argues that his appellate counsel "fail[ed] to raise [this] meritorious issue[.]" (Pet. at 7.) The Appellate Division held that Petitioner's claim was without merit. <u>Leslie</u>, 837 N.Y.S.2d at 306.

Petitioner's claim regards actions taken during a grand jury. "The trial jury's guilty verdict necessarily renders any irregularities before the grand jury harmless as it establishes not only that there existed probable cause to indict the defendant, but also that the defendant was 'in fact guilty as charged beyond a reasonable doubt.'" <u>Burden v. Filion</u>, 421 F. Supp. 2d 581, 588-89 (W.D.N.Y. 2006) (quoting <u>United States v.</u>

Mechanik, 475 U.S. 66, 68, 106 S. Ct. 938, 89 L. Ed. 2d 50 (1986); citing Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989)). Petitioner had a right to testify during his trial; through this testimony, Petitioner would have had the opportunity to influence the jury's verdict.  As counsel's failure to argue this point would not have overcome Mechanik, Petitioner fails to show any prejudice caused by appellate counsel's actions.  See Strickland, 466 U.S. at 687.

"Moreover [Appellate] counsel does not have a duty to advance every non[-]frivolous argument that could be made." Mayo, 13 F.3d at 533.  The Court presumes appellate counsel's performance was proficient.  See Strickland, 466 U.S. at 689.  After reviewing the relevant proceedings herein, the Court finds appellate counsel's failure to advance this claim was reasonable.  Id. at 688-89.  Further, "[a] brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." Jones v. Barnes, 463 U.S. at 753.

Petitioner's brief includes other ineffective assistance of appellate counsel claims that were unpleaded in his Petition.  Petitioner claims that his appellate counsel failed to: (1) demonstrate Petitioner's actual innocence on direct appeal and (2) argue trial counsel was ineffective as to his failure to impeach witnesses.  (See Pet'r's Br. 56-60.)  These

claims are procedurally barred. In any event, they also fail substantively. Once again, Appellate counsel did not have a duty to advance every frivolous contention, especially when those contentions might have buried good arguments. See Jones, 463 U.S. at 753. The State courts and this Court held that Petitioner's trial counsel arguments were without merit; the Court presumes appellate counsel made a reasonable decision to present Petitioner's strongest claims in the appeal. Accordingly, Petitioner's ground two claims are wholly DENIED.

III. Ground Three: Denial of Due Process Rights

Petitioner argues that he was denied his due process rights when the trial court denied his motion to vacate even though newly discovered evidence "shows that [Petitioner's] conviction should be reversed." (Pet. at 9.) Petitioner argues that, two years after his conviction, new evidence proved that "the prosecutor relied on perjured testimony and false police reports to obtain her conviction." (Pet. at 9.)

Petitioner argues that a post-conviction report by the Suffolk County Police Department's Internal Affairs Bureau, regarding the actions of Petitioner's brother (Suffolk County Police Detective, Patrick Leslie) during the shooting, "vindicate[d]" Petitioner's brother from wrongdoing. (Pet. at 9.) Petitioner argues this vindication proves that the police officer witnesses perjured themselves. (Pet. at 9.) "Had the

[j]ury seen proof Suffolk County [p]olice [o]fficers were 'intentionally misleading' the Court . . . [the jury's] findings would have changed the results of [P]etitioner's trial." (Pet. at 9.)

A.  Standard

In habeas proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

The United States Supreme Court has held that federal courts should give substantial deference to state criminal procedural rules "so long as [they] [do] not 'offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental' based on historical practice, the process's operation, and the Court's own precedent."  McKithen v. Brown, 626 F.3d 143, 152-53 (2d Cir. 2010) (quoting Medina v. California, 505 U.S. 437, 443, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992)).

> At any time after the entry of a judgment, the [trial court] . . . may, upon motion of the defendant, vacate such judgment upon the ground that: . . . (g) [n]ew evidence has been discovered . . . which could not have been produced by the defendant at the trial . . . and which is of such character as to create a probability that . . . the verdict

would have been more favorable to the
defendant. . . .

N.Y. CRIM. PROC. LAW § 440.10(1)(g).

> The new evidence may only be considered if it
> satisfies [] six criteria, i.e., (1) it must
> be such as will probably change the result if
> a new trial is granted, (2) it must have been
> discovered since the trial, (3) it must be
> such as could not have been discovered before
> trial by the exercise of due diligence, (4)
> it must be material to the issue, (5) it must
> not be cumulative, and (6) it must not be
> merely impeaching or contradictory to the
> former evidence.

People v. Hamilton, 115 A.D. 3d 12, 979 N.Y.S.2d 97, 103 (2d

Dep't 2014) (emphasis added) (citing People v. Salemi, 309 N.Y.

208, 216, 128 N.E.2d 377 (N.Y. 1955); People v. Marino, 99 A.D.3d

726, 730, 951 N.Y.S.2d 740 (2d Dep't 2012); People v.

Tankleff, 49 A.D.3d 160, 179, 848 N.Y.S.2d 286 (2d Dep't 2008)).

B.  Analysis

The County Court denied Petitioner's motion to vacate.

(See, e.g., Pet'r's July 14, 2011 Letter ("July 2011 Letter"),

Docket Entry 22, at 1.)  The court held that since Petitioner had

"neither seen nor read a copy of the report . . . his argument is

purely speculative and is not actually based on any newly

discovered evidence at all."  (July 2011 Letter at 1.)  The

Appellate Division denied Petitioner's application for leave to

appeal the County Court's holding.  (See Pet'r's August 9. 2012

Letter, Docket Entry 24, at 5.)

Petitioner did not produce--for the State courts or for this Court--the purported Internal Affairs report.[8]  As the court held, Petitioner's "evidence" is speculation, at best.  Moreover, § 440.10(g) does not permit vacatur based on new evidence that merely impeaches the evidence presented at trial.  <u>Hamilton</u>, 979 N.Y.S.2d at 103.  Petitioner's argument wholly regards impeachment of the police officers' testimony.  As the State procedural rule does not violate the <u>Medina</u> deference framework, the County Court did not violate Petitioner's Due Process rights by denying his motion to vacate.  Accordingly, Petitioner's claim on ground three is DENIED.

CONCLUSION

For the reasons set forth above, Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED.  Because there can be no debate among reasonable jurists that Petitioner was entitled to habeas relief, the Court does not issue a Certificate of Appealability.  28 U.S.C. § 2253(c); <u>see</u> <u>also</u> <u>Middleton v. Att'ys Gen.</u>, 396 F.3d 207, 209 (2d Cir. 2005).

[BOTTOM OF PAGE INTENTIONALLY LEFT BLANK]

---

[8] In fact, Petitioner has filed additional letters regarding the Internal Affairs Report.  (See Docket Entry 29.)

The Clerk of the Court is directed to mail a copy of this Memorandum and Order to the pro se Petitioner and to mark this matter CLOSED.

                                                  SO ORDERED.


                                                  /s/ JOANNA SEYBERT
                                                  Joanna Seybert, U.S.D.J.

Dated:     July   11  , 2014
           Central Islip, NY